## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MEDTOX SCIENTIFIC, INC., | Civil No. 06-3546 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| TAMARAC MEDICAL, INC. and ESCA TECH, INC., | |
| Defendants. | |

Darren B. Schwiebert and Lora Esch Mitchell, **FREDRIKSON & BYRON, P.A.**, 200 South Sixth Street, #4000, Minneapolis, MN 55402-1425, for plaintiff.

Melvin B. Sabey, **KUTAK ROCK, L.L.P.**, Suite 3100, 1801 California Street, Denver, Colorado, 80202-2658; Kristine M. Boylan and Rachel K. Zimmerman, **MERCHANT & GOULD, PC**, 3200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402-2215, for defendant Tamarac Medical, Inc.

Brian Stender, **PATTERSON, THUENTE, SKAAR & CHRISTENSEN, P.A.**, 4800 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402-2100, for defendant ESCA Tech, Inc.

This matter is before the Court on the motion of plaintiff Medtox Scientific, Inc. ("Medtox") for a preliminary injunction. On September 14, 2006, this Court granted a temporary restraining order intended to maintain the status quo until the Court could consider Medtox's motion after full briefing and a hearing. Medtox now moves the

Court for a preliminary injunction against defendant Tamarac Medical, Inc. ("Tamarac").[1]  For the reasons set forth below, the Court grants Medtox's motion.

## BACKGROUND

Plaintiff Medtox provides specialized laboratory testing services including filter paper lead testing used in blood tests.  Defendant ESCA Tech, Inc. ("ESCA") manufactures and distributes "D-Lead waterless hand soap" and "D-Wipe towels," products that remove lead from the skin surface prior to blood testing.  Defendant Tamarac distributes these products pursuant to an exclusive technology license agreement with ESCA.  The license agreement "grants to [Tamarac] an exclusive license within the United States under the Patent Application to use, sell and offer for sale the Products for use" in the relevant market.  (Decl. of Darren Schwiebert in Supp. of Pl.'s Resp. to Tamarac's Sur-Reply Br., Ex. A.)  ESCA has applied for a patent for the D-Lead and D-Wipe products, but no patent has yet been issued for these products.  Medtox occasionally uses the D-Lead and D-Wipe products in test kits when required to meet customer specifications.

Medtox alleges that Tamarac has made false statements on several occasions by claiming an exclusive right to the D-Lead and D-Wipes products based on the pending patent application. According to Medtox, Tamarac's bid to the State of Ohio (the "Ohio bid") to provide such products represented that Tamarac had the exclusive right to the D-Lead and D-Wipes products, and that any other offer to provide such products "should be

---

[1] On September 27, 2006, Medtox agreed to withdraw its motion for preliminary injunction against defendant ESCA Tech, Inc.

seriously questioned by the State of Ohio." (Pl.'s Ex. B to Braun Decl., at 3.) Tamarac's Ohio bid stated that "Tamarac Medical, Inc. is the only laboratory in the United States that can, without restriction, provide all of the required brand specific components of the Waterless Filter Paper Collection Kit." (*Id.* at 2.) The Ohio bid also stated "the right to exclusive use of these products, as well as any other products performing essentially the same function, is additionally protected by a United States Patent Application." (*Id.*) Medtox further alleges that Tamarac misrepresented the status of its patent rights in a recent bid to the Multnomah County Department of Health in Oregon.

In addition, Medtox has submitted evidence of Tamarac communications (the "e-memo") to a customer that references the pending patent application. The e-memo states that "[the D-Lead and D-Wipe] products are not available to or from any other laboratory in the U.S., and they may not be used with any other capillary blood lead test. This exclusive use is further protected by a United States patent application." (Decl. of Darren Schwiebert in Supp. of Pl.'s Resp. to Tamarac's Sur-Reply Br., Ex. B at 3.)

On September 6, 2006, Medtox filed a motion for a temporary restraining order with the Court. On September 14, 2006, the Court issued an order granting plaintiff's motion pursuant to Federal Rule of Civil Procedure 65(b). The Order enjoins Tamarac from "stating or implying that ESCA Tech, Inc.'s pending patent application gives defendants the right to exclude Medtox Scientific from marketing or selling competing products." *Medtox Scientific, Inc. v. Tamarac Med., Inc. and ESCA Tech, Inc.*, Civil No. 06-3546 (D. Minn. Sept. 14, 2006).

On October 12, 2006, Medtox filed an emergency motion to enforce the TRO. According to Medtox, Tamarac was distributing a summary brochure at a conference stating that "D-Lead Soap and D-Wipe Towels are technology licensed to Tamarac Medical. They cannot be used with any other capillary blood lead test. U.S. patent applied for." (Decl. of Varen Herman, Ex. A.) Medtox argues that the summary brochure language violates the temporary restraining order because it implies that no other blood test provider can use the D-Lead and D-Wipe products as a result of a pending patent application. Medtox's emergency motion requested that the Court further enjoin Tamarac from distributing the summary brochure, and from referring to ESCA's patent applications in proximity to a claim of exclusivity. Medtox subsequently agreed to have these issues addressed during the preliminary injunction hearing.[2]

Medtox now seeks a preliminary injunction preventing Tamarac from representing that it has an exclusive right to the D-Lead and D-Wipe products as a result of the pending patent application. First, Medtox seeks to enjoin Tamarac from distributing the summary brochure. Second, Medtox seeks to enjoin Tamarac from representing that it has any rights based on the pending patent application. Third, Medtox seeks to enjoin Tamarac from mentioning the patent application in proximity to an assertion of exclusivity to the D-Lead and D-Wipe products. Finally, Medtox seeks to enjoin Tamarac from stating or implying that competitors cannot sell the D-Lead and D-Wipe products.

---

[2] The Court addresses the relief sought by Medtox in its emergency motion as part of its motion for preliminary injunction. Accordingly, Medtox's emergency motion to enforce temporary restraining order [Docket No. 31] is denied as moot.

## ANALYSIS

Courts analyze four factors in determining whether a party is entitled to a preliminary injunction: 1) the probability that the movant will succeed on the merits; 2) the threat of irreparable harm; 3) the balance between the harm and the injury that granting the injunction will inflict on the parties, and 4) the public interest.  *Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction."  *West Publ'g Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986).

### I.   SUCCESS ON THE MERITS

Medtox argues that Tamarac's representations constitute false advertising under the Lanham Act and the Minnesota Deceptive Trade Practices Act.  *See* 15 U.S.C. § 1125(a)(1); Minn. Stat. § 325D.44, subd. 1(5).  Analysis of false advertising claims under Minnesota state law is "substantially similar to that applicable to federal claims under the Lanham Act."  *Alternative Pioneering Sys., Inc. v. Direct Innovative Prods., Inc.*, 822 F. Supp. 1437, 1441 (D. Minn. 1993).  The Court will therefore analyze only the Lanham Act claim to determine whether Medtox is likely to succeed on its false advertising claims.  *Id.*

To prevail on a false advertising claim under the Lanham Act, Medtox must show that 1) Tamarac made false statements of fact about its product, or about Medtox's

product, in a commercial advertisement, 2) the advertising actually deceived or intended to deceive a substantial segment of its audience, 3) the deception is material because it is likely to influence buying decisions, 4) Tamarac caused its false statements to enter interstate commerce, and 5) Medtox was injured or is likely to be injured as a result. *See Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F. Supp. 2d 1016, 1022 (D. Minn. 2000).

"The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: 1) commercial claims that are literally false as a factual matter, and 2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998). A statement may be literally false by implication if the intended audience would recognize the claim "as readily as if it had been explicitly stated." *Millennium Import Co. v. Sidney Frank Importing Co.*, 2004 WL 1447915, at *5 (D. Minn. June 11, 2004). If a plaintiff establishes that the defendant's commercial claim is literally false, the court may grant injunctive relief without considering the advertisement's actual impact on the consuming public, and actual consumer confusion need not be proved. *United Indus.*, 140 F.3d at 1180.

### A. Literal Falsity

Medtox argues that Tamarac's statements to customers are literally false because they state that a pending patent application excludes other parties from providing the D-

Wipe and D-Lead products. Tamarac responds that its license agreement with ESCA Tech does exclude other parties from providing the products in question. According to Tamarac, the terms of the license agreement require ESCA to refuse to sell D-Wipe and D-Lead products to third parties for use in the licensed method. As such, Tamarac argues that claims of exclusivity contained in its communications to potential customers are not literally false.

The Court finds that Medtox is likely to succeed on its claim that Tamarac's statements to customers are literally false in violation of the Lanham Act. Although the license agreement between Tamarac and ESCA grants Tamarac an exclusive contract right to the D-Lead and D-Wipe products, ESCA's pending patent application does not confer a monopoly upon Tamarac to those products. *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 935 F.2d 1263, 1266 (Fed. Cir. 1991) (Newman, J., concurring) (stating the rule that "an inventor has no enforceable rights under the patent laws until the patent securing those rights has issued"); *Tripp v. United States*, 406 F.2d 1066, 1071 (1969). As such, specific statements by Tamarac that its rights of exclusivity are protected by a pending patent application are false. Additionally, Tamarac's inclusion of the words "U.S. patent applied for" directly following its claim of exclusivity in the summary brochure is false by necessary implication. The Court finds that there is a likelihood that even a sophisticated consumer audience could read such statements to necessarily imply that Tamarac's rights are protected *because* a patent application has been filed. Based on the evidence of false statements contained in the Ohio bid, the e-memo, and the summary

brochure, the Court concludes that Medtox is likely to succeed on the issue of literal falsity.

### B.     Remaining Elements of the Lanham Act Claim

Because Medtox has demonstrated a likelihood of success on the element of literal falsity, the Court need not consider the remaining elements of the Lanham Act addressing actual consumer impact. *See United Indus.*, 140 F.3d at 1180. The Court notes, however, that Medtox has submitted evidence showing that customers have understood Tamarac's statements as providing an exclusive right to the D-Wipe and D-Lead products based on the patent application. Medtox has also shown that the false statements have influenced the buying decisions of potential customers.

Tamarac does not dispute that its statements satisfy the interstate commerce requirement of Medtox's Lanham Act claim. As to the element of injury, as explained below, injury is presumed when a Lanham Act plaintiff shows that a defendant's statements are literally false. The Court thus finds that Medtox is likely to succeed on the remaining elements of its Lanham Act claim against Tamarac.

## II.     IRREPARABLE HARM

Because Medtox has shown that it is likely to succeed on the merits of its Lanham Act claim, the Court presumes that Medtox has suffered irreparable harm as a result of Tamarac's false advertising. *United Indus.*, 140 F.3d at 1183. The irreparable harm factor therefore favors the grant of preliminary injunctive relief.

### III.   BALANCE OF HARMS

The balance of harms factor requires the Court to consider the balance between harm to the movant and the injury that an injunction would cause to other interested parties. *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994).  The scope of injunctive relief sought by Medtox merely seeks to prevent Tamarac from falsely claiming exclusive rights based on the patent application.  Such relief requires Tamarac to make relatively small changes in its advertising and communications to customers and potential customers.  On the other side of the scale, Medtox has submitted evidence showing that Tamarac's advertising practices have caused Medtox to lose customers and good will.  As such, the Court finds that the harm inflicted by requiring such changes is outweighed by the harm that would be sustained by Medtox in the absence of injunctive relief.  The balance of harms factor therefore tips in favor of Medtox's motion for a preliminary injunction.

### IV.   PUBLIC INTEREST

The consuming public must be able to accurately assess the quality of various products in accordance with their preferences.  *Alternative Pioneering Sys., Inc.*, 822 F. Supp. at 1444-45.  "False or misleading advertising deprives the public of that information and may lead them to make purchases they might not otherwise make if they were supplied with truthful information."  *Id.* at 1445.  Accordingly, the Court finds that the public interest factor supports Medtox's motion for preliminary injunction.

The Court concludes that each of the four *Dataphase* factors supports Medtox's motion for a preliminary injunction. The Court thus crafts an injunction that goes no further than necessary to correct the deceptive aspects of Tamarac's advertising.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Medtox's Motion for Preliminary Injunction [Docket No. 3] is **GRANTED in part**, as follows:

   a. Tamarac is enjoined from representing that its rights to the D-Lead and D-Wipe products are protected by a United States patent or a patent application.

   b. If Tamarac intends to refer to its rights under the exclusive license agreement in proximity to a statement about the patent application, Tamarac must include language that makes clear that any right of exclusivity does not arise from the patent application. Tamarac's distribution of the summary brochure, and of any similar statements in advertising or communications to customers, is therefore enjoined until such modifications have been made.

2. In accordance with Rule 65(c) of the Federal Rules of Civil Procedure, Medtox shall post a bond with the Clerk in the amount of $10,000.00 for the payment of

such costs and damages as may be incurred or suffered by defendants in the event defendants are found to have been wrongfully enjoined or restrained.

3. This Order shall go into effect upon the posting of the bond, and shall remain in effect until further order of this Court dissolving this Preliminary Injunction. The Temporary Restraining Order [Docket No. 11] issued by this Court on September 14, 2006 will be dissolved when this Order goes into effect.

4. Medtox's emergency motion to enforce temporary restraining order [Docket No. 31] is **DENIED as moot**.

DATED: January 4, 2007　　　　　　　　　　　　s/ John R. Tunheim\_
at Minneapolis, Minnesota.　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　United States District Judge